United States District Court
Southern District of Texas
**ENTERED**
June 12, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MAURO  SERRANO III, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-77 |
| | § | |
| REPUBLIC SERVICES, INC., *et al*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING LIABILITY PHASE OF BIFURCATED TRIAL**

Plaintiffs filed this collective action for unpaid wages and overtime premium pursuant to the Fair Labor Standards Act (FLSA) against their employers, Republic Services, Inc., BFI Waste Services of Texas, L.P., Republic Waste Services of Texas, Ltd., and Allied Waste Services, Inc. (jointly Republic).   The parties agreed to a bifurcated bench trial of this matter in which the first phase would cover liability issues. The Court tried that phase on April 25 to 27, 2017.

The liability issues are:

(1)     Whether the FLSA requires that the employer and employee come to an agreement or understanding regarding compensation for non-production time;

(2)     Whether there was an agreement or understanding between Plaintiffs and Republic that the piece rate by which they were paid compensated Plaintiffs for both production and non-production work;

(3)     Whether Plaintiffs' on-the-clock work was unpaid non-production time;

(4)     Whether Republic violated the maximum hour overtime provision by paying an incorrect regular rate for the first 40 hours in a workweek and, therefore, an incorrect overtime premium for all hours worked over 40 in a workweek;

(5)     Whether Republic acted in good faith so as to avoid liquidated damages;

(6)     Whether any FLSA violation was willful so as to extend the statute of limitations to three years; and

(7)     Whether the collective action should be decertified.

The Court issues the following as its findings of fact and conclusions of law and DENIES Defendants' Motion for Judgment on Partial Findings (D.E. 230).

## I.     The Work and Method of Driver Compensation

**A Driver's Typical Day**.  Plaintiffs are Roll-Off Drivers[1] in Republic's industrial division.  In a typical day, they clock in upon arrival at Republic's yard by 5:00 a.m.  On some days, they are required to attend safety, OSHA, or training meetings.  Bradley, D.E. 234, p. 68.  Those meetings are held approximately two or three times a month for fifteen to twenty minutes each.   Bradley, D.E. 234, p. 69.   They then check in with the dispatchers and get route sheets that list their tasks for the day, which they are ordinarily free to accomplish in any order they choose.  Those tasks include any combination of: (a) delivering a box to a new customer; (b) dropping an empty box and hauling an existing customer's filled box to the landfill and dumping it, taking the now-empty box to the next customer and repeating the process; (c) hauling an existing customer's box to the

---

[1]  The position name is descriptive of rolling a trash container onto a truck and then, after dumping the trash, rolling it back off.  Chapa, D.E. 233, p. 123.

landfill and dumping it, and then returning the same box to that same customer; and (d) hauling a box, dumping it, and taking the box back to Republic for a terminating customer.  The assignments are unpredictable and are revised daily such that the drivers do not have regular routes that they service exclusively; each driver may be assigned to any customer on a given day.  They average about 6-8 hauls per day when circumstances permit.

The dispatcher also provides an activity sheet (for logging certain events of the day), along with truck assignments, a fuel card, and keys.  The drivers then conduct Department of Transportation (DOT) mandated pre-trip inspections of their vehicles and retrieve any necessary trash boxes before heading out to their first customers.  If all goes smoothly, the driver picks up a full trash box, hauls it to the landfill, gets the haul weighed, dumps the trash from the box into the landfill, gets a ticket evidencing completion of that dump, then proceeds to the next task.  The drivers refer to this as a "bump and dump."

It is not unusual, however, for drivers to encounter impediments to completing the bump-and-dumps.  Sometimes a box would be overflowing with trash or have trash stacked unevenly such that the driver has to reposition the load for safe hauling. Climbing on top of the box and redistributing the trash for safe transport can take about twenty to thirty minutes.  Rincon, D.E. 234, p. 126.  The drivers also testified to frequent blockages, in which something under the customer's control blocks their access to the box they are to pick up.  When these customer service issues arise, which happens two to three times a day on average, the drivers have to alert dispatch so that dispatch can

3 / 42

contact the customer to resolve the issue.  *See generally*, Baca, D.E. 234, p. 205; Sanchez, D.E. 234, p. 232.

Republic's dispatchers who testified confirmed this.  The drivers stated that it could take fifteen to thirty minutes on average to resolve those problems.  Serrano, D.E. 234, p. 87; Rincon, D.E. 234, p. 127; Benavides, D.E. 234, p. 167; Sanchez, D.E. 234, p. 232 (one might be real quick and the other take "like forever," twenty-five to thirty minutes).  Dispatcher Theresa Ortiz testified that it would take three to five minutes. Ortiz, D.E. 234, pp. 23-24.  The Court FINDS that the dispatcher's call takes three to five minutes, but that the customer's resolution of the issue—removing that which blocks the trash container pickup—generally takes fifteen to twenty-five minutes.

Occasionally, there are boxes in need of repair and the drivers have to find ways to keep the doors shut or replace missing tarps to cover the load so that the trash does not fly out in route to the landfill.  Sometimes, the drivers cannot make the haul safe and they lose that haul.  Rincon, D.E. 234, p. 126.  If Republic agrees, the driver may still be paid for a "dry run."  And if a load was picked up too late to go to the landfill, then that (or another) driver will have to start the next day by dumping that load before proceeding with his route.  All of these circumstances cause delays, making the drivers' day longer and impairing their ability to complete all of the hauls on their routes.

Drivers are also frustrated by Republic's poor stock of empty boxes because they lose time in search of the right sized box in sufficient condition to deliver to a customer on their route.  If the box is in stock at the yard, it takes ten to fifteen minutes to load it on the truck.  Serrano, D.E. 234, p. 92.  Sometimes—on average two to three times a

week—they are required to search more than one yard to find an acceptable box, which can extend the time an additional twenty to twenty-five minutes for drive time and ten to fifteen minutes for search and load.  Serrano, D.E. 234, p. 92; Rincon, D.E. 234, p. 130; Benavides, D.E. 234, p. 171; Sanchez, D.E. 234, p. 233 (looking for boxes takes about 45 minutes).   And the trucks can have mechanical breakdowns and flat tires.   In those situations, the drivers have to wait for a Republic mechanic to arrive and repair the truck before they can continue their routes.   Last, the drivers complained that there can be extensive wait times at the landfill, particularly in bad weather, sometimes exceeding an hour in which all they can do is wait in line.

Prisons and the ExxonMobile, Oxy, NRG Energy, and similar facilities have elaborate security clearance procedures by which the driver and the truck have to be cleared.  The driver might have to wait in line to enter the inspection area; park the truck and open its hood; go inside the facility, surrender his wallet, and go through a personal safety check; then, after getting clearance, obtain an escort; drive very slowly and attend to the pick-up of the container; return through the same inspection area and have the truck re-inspected; and retrieve his wallet before exiting, all of which adds fifteen to thirty minutes on each side of the container pick-up.  Serrano, D.E. 234, pp. 93-95; Rincon, D.E. 234, pp. 154-55.

At the end of the day, the drivers return to the Republic yard, fuel up their truck (sometimes having to wait in line to do so), park it, and conduct a DOT-mandated post-

trip inspection.[2]  They fill out any additional DOT paperwork, such as duty logs when their work day exceeded 12 hours, and complete their route and activity sheets.  They then check out with dispatch, turning in their fuel card and keys and wait for the dispatcher to review the paperwork to ensure that it is complete.  Then the drivers clock out.  This procedure takes, on average, forty-five minutes to an hour each day.  Rincon, D.E. 234, pp. 132-33; Sanchez, D.E. 234, pp. 234-35 (post-trip activities normally take about 30 minutes; bad days can add another 20 minutes).

The drivers' testimony regarding the nature of the work and the typical delays that frequently impair their ability to complete their bump-and-dump tasks was uncontroverted, if not corroborated, by Republic witnesses.

**The Pay Structure Disclosed to Drivers**.  Likewise, the manner in which Republic compensated the drivers is largely uncontroverted.  Republic formulated a series of rates that it calls "Roll Off and Longhaul Commission Zones."  Plaintiffs' Exhibit 13 (DEF 000273, 00281).  In FLSA terms, these are "piece rates."  *See generally*, 29 U.S.C. § 207(g).  The confidential table of rates lists the amount that Republic will pay the driver for each haul.  It is undisputed that this table was the only information provided to the drivers regarding Republic's pay plan when they were hired.  Republic told the drivers that they were hired to work only on this commission basis.

None of Republic's management witnesses were involved in the original formulation of the zone/commission pay rates and they did not know how they had been

---

[2]  Fueling ordinarily takes ten to fifteen minutes.  Serrano, D.E. 234, pp. 89-90.  With one of the newer trucks that requires a fuel additive, the fueling process can take twenty to twenty-five minutes.  Rincon, D.E. 234, p. 133.

calculated, other than that they appear to be based upon the distance of the customers'
boxes to the landfill or to Republic's yard.  *See* Map, Defendant's Exhibit 35;[3] *see also*
Chapa, D.E. 233, pp. 54, 167-68; Bradley, D.E. 234, p. 45 (zones are from the office);
D.E. 230, p. 3 (Defendants reciting that zone rates are based on distance to landfill).
Plaintiffs acknowledged that Republic did not agree to pay additional monies for non-
production time or make any representations to that effect.  Serrano, D.E. 234, p. 99;
Benavides, D.E. 234, p. 190.  However, Plaintiffs provided a number of route and activity
sheets detailing down time.  Plaintiffs' Exhibit 43.

Examples of uncompensated non-production time included arriving to find a
customer who did not want the haul that day, a customer's location that included twenty
minutes after arrival to get to the box and another twenty minutes to get the box off the
property, sixty-five minutes from arrival to loading of a box at a ranch, thirty-five
minutes for a flat tire, finding a container that was damaged with spray painting, ninety-
five minutes having to return to the yard to replace a missing tarp, and twenty minutes
spent closing a door on the container.  *Id*.  The fact that these obstacles to efficiency exist
and are confronted on a daily basis was undisputed and even corroborated by the
dispatchers who testified.

**Additional Provisions of the Pay Plan**.  Republic maintains a pay plan with
provisions in addition to the zone commission rate sheet.  The content of the full pay plan

---

[3]   None of the witnesses could authenticate the map, pinpoint when it was created or what it meant, but it was part
of Republic's records from which it enforced its rate structure.  Bradley, D.E. 234, pp. 45-46.

is not shared with drivers.[4]   And it is not always followed.   For instance, the pay plan calls for the payment of the zone rate for dry runs—where the driver gets to the customer but, for some reason, the container cannot be hauled.   That dry run payment would not be made if there was a nearby customer that the driver could move on to.   Serrano, D.E. 234, pp. 112-13; Baca, D.E. 234, pp. 210-11.

The plan also states that day rates[5] apply to Roll-Off Drivers, but only if they make no hauls.[6]   Republic's General Manager, Robert Bradley (Bradley) testified that, contrary to the letter of this plan, day rates were used even when a driver made hauls if the day rate exceeded the alternative zone commissions that had been earned by those hauls.   Bradley, D.E. 234, p. 61.   Also, contrary to the letter of the plan, Bradley testified that when drivers had completed some hauls, their day rate would be supplemented with a small amount per haul rather than the regular zone rate.   Bradley, D.E. 234, p. 42.

Bradley reasoned that a day rate compensated a driver for all hours worked. Therefore, if a driver received the greater of the day rate or his piece rate commissions (earned despite having obstacles to completing a route), either method of compensation necessarily paid the driver for all hours worked.   In this manner, even if a truck breakdown kept the driver from making hauls all or part of a day, he was still paid for all of his time.   Thus, without ever having disclosed the existence or amount of a day rate to the drivers prior to them beginning work, Bradley contends that Republic's safety net of

---

[4]  Chapa, D.E. 233, p. 162 (does not know of any disclosure other than zone rates and pay sheets).

[5]  The day rates vary by location and type of truck.  Bradley, D.E. 234, p. 55.

[6]  "If driver does not get any commissions and works that day, he will be paid high day rate."  *Id*. (DEF 000267, 000274, 000276).

the prescribed day rate (or a greater piece rate) fully compensated a driver who normally worked only on a commission or piece rate basis.

To compare the standard zone rate potential earnings to the day rate, the Court looked at the average zone rate[7] and multiplied it by seven hauls.[8]  The day rates[9] were, on average, roughly 38% of what could be earned by completed hauls.  By the third haul, using the average rate, the daily rate would be exceeded.  So by Republic's logic, obstacles that prevent four out of seven hauls do not require separate compensation.

This theory appears to be put in practice by Republic's policy of not providing any day rate in addition to hauls unless the driver's down time exceeds four hours.  Chapa, D.E. 233, p. 110.  Jose Rincon testified that he had never seen a day rate applied where there was excessive down time caused by a mechanical breakdown or other significant loss of ability to make hauls.  Rene Sanchez once turned in a route sheet showing 4.5 hours of down time.  He was paid the zone commission rate for the two hauls he managed to make because they rendered a greater amount of pay than the alternative day rate would have.  Sanchez testified that he had been instructed to write down all down time. He did so, but never saw any additional compensation for it.

Republic contends that the drivers agreed to this arrangement despite never being advised of the terms of the full pay plan and its day rate (original or as applied).  When a day rate was paid, it appeared on the corresponding pay stub.  Republic relies on the

---

[7]  Plaintiffs' Exhibit 13 (DEF 000281).

[8]  Chapa testified that, on a smooth day, drivers could make six to eight hauls.  Chapa, D.E. 233, p. 122.  *See also*, Serrano, D.E. 234, p. 120; Ricon, D.E. 234, p. 127 (six to seven hauls in town, four out-of-town).

[9]  Plaintiffs' Exhibit 13 (DEF 000278).

drivers' continued work after each pay period to demonstrate actual or constructive knowledge of how they had been paid.

Bradley testified that the only reason to clock driver hours was to keep track of overtime.  In this manner, Republic has equated the overtime premium triggered by hours over 40 in a workweek as compensation for the down time, straight time hours within the initial 40 hours.  Pursuant to this logic, a driver might work 30 hours of production time and 11 hours of non-production time in a week, triggering one overtime hour.  Republic's assertion is that one hour's fifty percent overtime premium pay is deemed to compensate for the ten hours of straight time worked but not productive toward a zone rate.  Republic supplied no authority for conflating straight time pay and overtime premiums.

**Contrasting Pay Structures**.  Republic's Operations Manager, Elbert "Dennis" Chapa, testified to the history of driver pay at the Corpus Christi facility.  He stated that, during the time that BFI owned the business, Roll-Off Drivers were paid a day rate plus $4.00 per haul.  After Allied acquired BFI, they were paid a day rate or a day rate plus a per haul amount.  It was only after Republic took over that Roll-Off Drivers lost the day rate component of their pay, but instead worked for the incentive/zone/commission rates.

Roll-Off Drivers and Long-Haul Drivers handle similar loads and work for the same zone rates.  However, the Long-Haul Drivers also receive a day rate along with the zone rates.  Bradley, D.E. 234, p. 56.  Chapa and Bradley testified that they received this combination rate because their routes included more drive time, the loads were heavier and transport was slower, and they were limited in the number of hauls they could

complete in a day—their pay was supplemented for impediments to production.  Chapa, D.E. 233, p. 61; Bradley, D.E. 234, p. 56.

**Internal Confusion**.  On May 20, 2013, Sally Scordato, a Division Human Resources Manager for Republic, sent an email to Chapa asking for the Corpus Christi pay plan.  "Specifically, I need to know your zone pays, day rates for RO drivers, downtime pay, help pay, landfill wait time pay etc."  Plaintiffs' Exhibit 71.  Chapa responded, in part, "We do not pay downtime or landfill wait time unless Supervisor approves or has efficient reasons to authorize increase."  *Id*.  Responding to her next email, Chapa wrote,

> In what situation would a supervisor approve downtime pay . . . and what would that rate be?  Depending on the downtime if driver goes down more than 4 hours and there's not an available truck, driver will get his day rate which avg.118.00 per day plus his completed hauls.

*Id*.  Scordato then forwarded the email thread to General Manager Bradley, saying,

> I guess I am still confused on the downtime and landfill wait time pay.  In my previous divisions, drivers were paid wait time and downtime much sooner than 4 hours.  Doesn't the downtime and wait time affect the drivers' overall pay since they more than likely will not get as many hauls due to something that was not within their control?  Have we ever paid downtime less than 4 hours?

*Id*.  There is no response to this inquiry or clarification in the record.

Republic's Senior Corporate Counsel, Kim Bullerdick, testified that in late 2012 or early 2013, he was advised by outside counsel experienced in wage and hour law about piece rates in California.  He was advised that California law required a specific agreement with respect to the amount to be paid for non-production time.  That

discussion, Bullerdick testified, gave him the impression that California law was different from the requirements of the FLSA in that respect. D.E. 235, pp. 28-29, 31. So he believed that the FLSA does not require an agreement or understanding with respect to compensation for non-production time and no Texas law contradicted that.

Bullerdick admitted that the specific question of the FLSA requirements was not addressed expressly. It was only implied. He testified that he did not seek any legal opinion on whether the Corpus Christi pay plan complied with the FLSA and did not recall ever seeing the pay plan prior to this lawsuit being filed. D.E. 235, pp. 38, 41. He was not aware of whether anyone at Republic ever sought or obtained an opinion regarding the Corpus Christi pay plan prior to settling the *Rodriguez*[10] case in San Antonio. And when an opinion was sought, it was clear that the lawyers did not have the full parameters of how the Corpus Christi area drivers were actually being paid, as opposed to what was set out in the pay plan. *See* Plaintiffs' Exhibit 32.

**Questions About Non-Production Time**. The drivers testified that no one ever explained to them that zone rates included any non-production time. Rincon, D. E. 234, pp. 123-24; Baca, D.E. 234, pp. 202-03. They consider their pay, based on what they have to do to earn it, to include bump-and-dump time—what it takes to get a landfill ticket on which the zone rate is earned. Serrano, D.E. 234, pp. 83-84, 107; Rincon, D.E. 234, p. 127; Baca, D.E. 234, pp. 221-22; Sanchez, D.E. 234, pp. 224-25. So when they

---

[10] *Rodriguez v. Republic Servs., Inc*., No. SA-13-CV-20-XR, 2013 WL 5656129 (W.D. Tex. Oct. 15, 2013) (denying defendants' motion for reconsideration and granting plaintiffs' motion for summary judgment); *Rodriguez v. Republic Servs., Inc*., No. SA-13-CV-20-XR, 2013 WL 4054707 (W.D. Tex. Aug. 12, 2013) (denying defendants' motion for summary judgment).

encountered a lot of down time, they would complain to their supervisor and would be told, "I'll take care of you," "Talk to Dennis," or they would be ignored.[11]

Jose Baca testified that he complained to Supervisor Larry Kelly and was told to ask Dennis. He had meetings with Dennis Chapa and got no resolution of the issue. Then he had an encounter with Bradley at the recycling center and asked about down time compensation. Bradley indicated that he knew they did not get extra pay for down time but did not offer any explanations for how the zone rates were supposed to compensate for that. Baca complained that they could pick up two boxes a block apart and have a smooth two-hour trip to the landfill for one and a delayed five-hour trip for the other, but get paid no more than they did for the two-hour job. Baca, D.E. 234, pp. 213-14.

Andrew Benavidez testified that he asked two supervisors about getting paid extra compensation for hauls from refineries because of the additional time it takes to get in and out of those facilities. But he did not get clear answers about how he was supposed to be paid for that additional time. Rene Sanchez asked Supervisor Larry Kelly, who responded, "Talk to the man," meaning Dennis Chapa. He also asked Supervisor Ray Medrano, who said "Write it down," referencing the route sheet. But the time written down did not bring extra compensation.

---

[11]    Serrano, D.E. 234, pp. 84, 105 (complained about landfill waits, container inventory, meetings, paperwork, customer service and can blockage-type issues and Supervisor Larry Kelly told him he would take care of Serrano); Rincon, D.E. 234, pp. 147-48 (Larry Kelly said he would take care of them for time spent with mechanical breakdowns), 155-56 (Rincon complained to his supervisor about the excessive security clearance time for certain hauls); Benavides, D.E. 234, pp. 163 (talked to Larry and Ray about excessive time at security clearance and was told to talk to Dennis), 193-95 (mentioned excessive wait time and Larry told him "I'll take care of you"); Baca, D.E. 234, p. 208 (was told they would take care of him or directed him to talk to Dennis); Sanchez, D.E. 234, pp.227-28 (spoke with Larry Kelly and Ray Medrano and was referred to Dennis Chapa or told to write it down).

## II.      The FLSA Requires an Agreement

Relying primarily upon 29 C.F.R. § 778.318, Plaintiffs contend that the FLSA requires that there be an agreement between the employer and employee with respect to compensation for non-productive time when the employer uses a piece rate pay structure. Republic contends that the FLSA does not require an agreement regarding payment for non-productive time and that the Department of Labor (DOL) interpretations embodied in § 778.318 are neither regulations nor binding.

These competing positions each have their place in an FLSA analysis.  It is true that, despite § 778.318, the FLSA does not require an employer to pay a certain amount for non-production time in straight-time calculations.  *See* DOL Opinion Letter, 1981 DOLWH LEXIS 10 (July 14, 1981).  These "gap time" claims are not cognizable under the FLSA.  *Karna v. BP Corp. North America, Inc*., 11 F. Supp. 3d 809, 817 (S.D. Tex. 2014);   The statute does not provide a cause of action for straight-time pay unless, and to the extent that, it falls below the minimum wage.  Plaintiffs do not seek straight time compensation here.

The statement in § 778.318(a) that such non-production time must be counted and paid for has only two purposes:  (1) to ensure that all time worked is paid at a rate of at least the minimum wage; and (2) to ensure that all time worked counts toward the maximum hours/overtime requirements.  Those two purposes are satisfied by Republic's pay structure.  The Court rejects any suggestion that Plaintiffs seek or would be entitled to damages for straight-time pay in an FLSA gap claim.

Where § 778.318 does come into play here is with respect to determining the regular rate for purposes of calculating overtime compensation.[12]   While dividing all compensation paid by all hours worked may yield the correct regular hourly rate for most pay schemes, the FLSA requires special handling where piece rates apply.   Without any definition of the number of hours included in a piece rate, the mathematical conversion to an hourly rate is uncertain and vulnerable to the dangers of detrimental labor conditions that the FLSA was intended to remedy.   *See generally,* 29 U.S.C. § 202(a) (congressional finding and declaration of policy).

Joe Burkel highlighted the dilemma of piece rates requiring some agreement when he responded to the question whether a pre-trip inspection is non-production time:

"Q  Okay, so pre-trip would be -- is that -- what is that, where does that fall?

"A  It depends on -- I don't mean to answer this way, but it kind of depends on who you answer – who you ask that question.   You know, in my mind that's part of the -- part of running a route.

"Q  Okay, all right.  What about post-trip?

"A  Same answer.

"Q  Okay.

"A  It could be considered, you know, non-productive because it's not actually running a route but, you know, depends on -- I don't -- you know, it could be included in the incentive pay rate or it could – you know, most of the time it is as being, you know, part of the incentive.

---

[12]  Computation of the overtime rate under the FLSA requires that the Court first determine Plaintiffs' regular rate of pay.  The regular rate must be expressed in terms of an hourly rate, regardless of the methodology by which the employee is paid. 29 C.F.R. § 778.109.

Burkel, D.E. 234, pp. 33-34.  Bullerdick also testified to the confusing concept of non-production time:  "Q:  So do you understand what non-production time is?  A:  Yes and no.  I think it's a very difficult term to put your arms around, but I understand the general concept."  Bullerdick, D.E. 235, p. 45.

Thus the statute and its DOL interpretations of piece rate pay structures are infused with requirements for agreements or understandings between the employer and employee as to what exactly the piece rate is intended to cover.  This is rooted in the terms of the FLSA and is not just a DOL interpretation.  The maximum hour provision of the FLSA reads:

> **(g) Employment at piece rates**
>
> No employer shall be deemed to have violated subsection (a) of this section [time-and-a-half overtime pay requirement] by employing any employee for a workweek in excess of the maximum workweek applicable to such employee under such subsection if, ***pursuant to an agreement or understanding arrived at between the employer and the employee before performance of the work***, the amount paid to the employee for the number of hours worked by him in such workweek in excess of the maximum workweek applicable to such employee under such subsection—
>
>> (1) in the case of an employee employed at piece rates, is computed at piece rates *not less than* one and one-half times the bona fide piece rates applicable to the same work when performed during nonovertime hours; or
>>
>> (2) in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established, is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours; or

(3) is computed at a rate *not less than* one and one-half times *the rate established by such agreement or understanding as the basic rate to be used in computing overtime compensation thereunder*: *Provided*, That the rate so established shall be authorized by regulation by the Administrator as being *substantially equivalent to the average hourly earnings of the employee*, exclusive of overtime premiums, in the particular work over a representative period of time;

and if (i) the employee's average hourly earnings for the workweek exclusive of payments described in paragraphs (1) through (7) of subsection (e) of this section are not less than the minimum hourly rate required by applicable law, and (ii) extra overtime compensation is properly computed and paid on other forms of additional pay required to be included in computing the regular rate.

29 U.S.C. § 207(g) (emphasis added).  The Court reads this provision as requiring, when an employee works at a piece rate, some agreement or understanding regarding what the piece rate covers—and an overtime rate that does not fall below one and one-half times the resulting regular rate.

The first option, § 207(g)(1), appears to apply to an agreement or understanding in which a single piece rate covers all hours worked.  The second, § 207(g)(2), applies when multiple piece or hourly rates are used in combination.  The third, § 207(g)(3), allows the employer and employee to specify a regular rate separate and apart from any piece or hourly rate, to serve as the regular rate for the time-and-a-half calculation—so long as it is consistent with a methodology approved by the DOL as approximating an actual hourly rate for the work done.  Each of these options requires "an agreement or understanding arrived at between the employer and the employee before performance of

17 / 42

the work."  29 U.S.C. § 207(g).  In other words, the difficulty of quantifying an hourly rate when an employee is paid by the piece requires that the employer and employee anticipate inevitable delays and come to an agreement regarding how (not if) that non-production time work is to be paid.

The DOL interpretations are consistent with, and expand upon, those concepts in 29 C.F.R. § 778.318.  The minimum wage is enforced by requiring that all time compensated by a piece rate, whether productive or non-productive, be counted and paid for—regardless of any agreement to the contrary.  § 778.318(a).  In other words, piece rates cannot be used to omit non-production time from the maximum hour requirement or to allow the inclusion of non-production time to bring the hourly rate below the FLSA minimum wage.  Because there is no question regarding when the drivers clock in and clock out and what they do in-between, straight time—in one form or another—must be paid for all time the employee works on the clock.

The calculation of the regular rate for non-productive time is, by default, the same rate as paid for productive time absent an agreement for a lesser rate (but never less than minimum wage).  § 778.318(b).  The parties are permitted to agree that the piece rate is sufficient and intended to compensate the employee for all hours worked, whether productive or non-productive.  "*If this is the agreement of the parties*, the regular rate of the pieceworker will be the rate determined by dividing the total piecework earnings by the total hours worked (both productive and nonproductive) in the workweek." § 778.318(c) (emphasis added).

The statutory language is compelling in requiring an agreement whenever overtime has to be calculated on a piece rate pay structure.  The statute does not expressly address how the Court should arrive at a regular rate in the absence of an agreement.  But it invites the Administrator to assist.  29 U.S.C. § 207(g)(3).  That is a reference to the Administrator of the Wage and Hour Division of the Department of Labor.  29 U.S.C. § 204.  The DOL interpretations[13] in § 778.318 fill that void by making it clear that, without any agreement regarding compensation for non-production time, the full piece rate, undiluted by that non-production time, applies.

While not binding with the full force of law or entitled to full *Chevron*[14] deference, the Court finds the administrative interpretations consistent with the language and intent of the statute and invited by its terms.[15]  As the Supreme Court stated in the context of another FLSA case:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.  The weight of

---

[13]  Part 778 of Volume 29 of the Code of Federal Regulations are interpretations rather than regulations.

This part 778 constitutes the official interpretation of the Department of Labor with respect to the meaning and application of the maximum hours and overtime pay requirements contained in section 7 of the Act.  It is the purpose of this bulletin to make available in one place the interpretations of these provisions which will guide the Secretary of Labor and the Administrator in the performance of their duties under the Act unless and until they are otherwise directed by authoritative decisions of the courts or conclude, upon reexamination of an interpretation, that it is incorrect. These official interpretations are issued by the Administrator on the advice of the Solicitor of Labor, as authorized by the Secretary.

29 C.F.R. § 778.1.

[14]  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 844 (1984).

[15]  "The interpretations of the law contained in this part 778 are official interpretations which may be relied upon as provided in section 10 of the Portal-to-Portal Act of 1947 (61 Stat. 84).  29 C.F.R. § 778.4; *see also*, 29 U.S.C. §§ 207(g)(3), 259(a).

> such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944).  The Court HOLDS that § 778.318 is entitled to significant weight in this dispute.

The Court CONCLUDES that Republic is not permitted to derive its regular rate for purposes of calculating the overtime premium by dividing its piece rate compensation by all hours worked including non-production time in the absence of "an agreement or understanding [to that effect] arrived at between the employer and the employee before performance of the work."  29 U.S.C. § 207(g).  The Court further CONCLUDES that, if there is no agreement, the regular rate is the total piece rate compensation divided only by the number of production hours used to earn that compensation.

### III.    The Parties Did Not Agree to a Pay Structure

Employees suing for unpaid overtime compensation under the FLSA must generally prove their claim with definite and certain evidence.  *Reeves v. Int'l Tel. & Tel. Co*., 616 F.2d 1342, 1351 (5th Cir. 1980), *implicit overruling on other grounds recognized in Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1042 n. 4 (5th Cir. 1999).  In order to agree to a pay structure, the parties had to have a meeting of the minds regarding the nature of non-production time.   Republic's witnesses have testified to five inconsistent positions on this matter:  (1) there is no non-production time in the waste

hauling business;[16] (2) the only non-production time is sick leave or annual leave;[17] (3) Republic does not compensate for down time;[18] (4) non-production time is compensated by day rates that are applied for down time over four hours in a day or when production does not exceed the day rate;[19] and (5) all non-production time is included in, and compensated by, the zone rates.[20]  Republic could not quantify how much non-production time was included in a zone rate.  Bradley, D.E. 234, p. 48.

        As demonstrated above, Republic did not share all of the terms of the pay plan with the drivers and it was not fully explained to them.[21]  Its pay plan did not expressly address non-production time.  And Republic did not apply the pay plan terms as written. Moreover, as Plaintiffs argued, it is disingenuous for Republic to argue that they had an agreement with their employees with respect to the treatment of non-production time when they had no consistent position on it.  Bradley denied ever meeting with drivers and explaining the zone rate's inclusion of any non-production time.   Bradley, D.E. 234, p. 48.   The drivers testified that they had not entered into any agreement regarding the manner in which non-production time was to be compensated.  Rincon, D.E. 234, p. 137.

        And when the drivers complained, they were not told that their down time was included in the zone rates or contingent day rates.  Instead, they were told to write it

---

[16]  Chapa, D.E. 233, pp. 155-56 (he had never heard the term non-production time prior to his deposition in this case); Bradley, D.E. 234, p. 43, 73.

[17]  Chapa, D.E. 233, p. 156; Bradley, D.E. 234, p. 70.

[18]  Chapa, D.E. 233, pp. 113, 168.

[19]  Bradley, D.E. 234, p. 81.

[20]  Chapa, D.E. 233, p. 113; Bradley, D.E. 234, pp. 46-47, 66-67.

[21]  Serrano, D.E. 234, pp. 83 (understanding that only the bump-and-dump was included in zone rate), 117-18 (no one ever explained non-production time); Rincon, D.E. 234, p. 123; Benavides, D.E. 234, p. 162.

down, that their supervisor would take care of them, or that they should discuss it with management.  Each instruction implied a promise of additional compensation or at least a matter that was up for negotiation rather than a pay structure that was set and agreed to.

In defense, Republic argued that, if an agreement was required, Plaintiffs—in fact—agreed because:  (1) they were provided with the zone rate sheet prior to starting work as Roll-Off Drivers; and (2) they continued to work as Roll-Off Drivers after being paid on a piece rate or day rate basis for all hours worked, as reflected in their weekly pay stubs.  The Court disagrees.  Such an approach fails to account for the inconsistency outlined above.

The cases upon which Republic relies work against it.  The opinions acknowledge that an agreement based on notice and acceptance evidenced by continued employment requires clear and consistent disclosure of the terms of that agreement.  "To prove notice, the employer 'must prove that he unequivocally notified the employee of definite changes in employment terms.' '[T]he employee must know the nature of the changes and the certainty of their imposition.' "  *Lindsey v. DynCorp Int'l, L.L.C.*, 385 F. App'x 414, 416 (5th Cir. 2010) (per curiam) (quoting *Hathaway v. Gen. Mills, Inc*., 711 S.W.2d 227, 229 (Tex. 1986)).

The *Hathaway* opinion observed that the employer equivocated in discussing the terms of the employment relationship sought to be imposed, rendering those alleged terms unenforceable.

> Hathaway testified that Berkley told him to discuss the changes with Duncan.  Hathaway further testified that Duncan, Hathaway's superior, told him that Duncan would

> take care of the problem.   Further, General Mills sent
> Hathaway a letter containing the new rates, and Duncan again
> told Hathaway not to worry and that Duncan would take care
> of it.  These conflicting signals from General Mills' managers
> make unequivocal notification a jury question.

*Hathaway, supra* at 229; *see also, Moran v. Ceiling Fans Direct, Inc*., 239 F. App'x 931,

936 (5th Cir. 2007) (per curiam) (finding employer inconsistency preclusive of implying

an agreement from continued employment, citing *Hathaway*).  Plaintiffs here testified to

very similar equivocation.

The Court FINDS that Plaintiffs and Republic did not enter into an agreement or

have a mutual understanding regarding compensation for non-production time or the

regular rate to be used in calculating the overtime premium.

## IV.   Plaintiffs Worked Some Non-Productive Hours

An employer must compensate an employee for all "principal activities"

performed during the day.  *See* 29 U.S.C. § 254(a)(2); *Colindres v. QuietFlex Mfg*., 427

F. Supp. 2d 737, 753 (S.D. Tex. 2006) (Rosenthal, J.).  Compensable principal activities

include those activities "performed as part of the regular work of the employees in the

ordinary course of business" and "performed at the employer's behest and for the benefit

of the business."  *Dunlop v. City Elec., Inc*., 527 F.2d 394, 401 (5th Cir. 1976) (taking a

broad view of the concept of "principal activities").

At issue here are the following tasks:   completion of DOT paperwork;

administrative matters, including safety, OSHA, and training meetings[22]; driving from the

---

[22] Republic objected to Plaintiffs inclusion of safety meetings in their non-productive time, arguing that Plaintiffs failed to identify such meetings in their Advisory (D.E. 202).  The Court finds that the claims set forth in the Joint Pretrial Order (D.E. 220) include safety meetings.  Republic's objection is overruled.

yard to the first customer and returning from the last landfill dump or customer delivery to the yard; waiting for customers to remove items blocking access to containers; resolving overflowing trash, damaged containers, missing tarps, and other customer complaints; getting through customer security clearances; searching for empty containers to deliver to customers; truck breakdowns; and excessive wait time at landfills.  There is no question that these tasks qualify as part of the principal activities of the drivers' work and must be included in driver compensation.  *See Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 725 (5th Cir. 1961) (considering a driver's principal activities to include checking and fueling the trucks, driving them from the yard to the contractor's plant, waiting in line to be loaded and unloaded, returning to the yard from the last jobsite, and cleaning and refueling the trucks after the end of the workday).

Principal activities—normal and necessary components of the job—can be productive or non-productive.  Either way, the hours must be counted and paid for.  And, in the absence of an agreement, a piece rate will cover only production time.  29 C.F.R. § 778.318.  So the question for the Court as the trier of fact is whether any of the categories of time Plaintiffs have questioned should be considered productive and included within the zone rates.  Republic's testimony was not helpful on that issue as no witness claimed to know how the zone rates were formulated, other than to state that they varied based on distance to the landfill.  Chapa, D.E. 233, p. 53; Bradley, D.E. 234, p. 44.

Plaintiffs argue that Republic's piece rate applies only to the bump-and-dump aspect of their work—in which they pick up the container, haul it to the landfill, weigh it, dump it, and get a landfill ticket that proves completion of those tasks.  They assert that they are

paid only on the basis of those tickets and any other time spent is non-production time. But that viewpoint is too narrow.

**Non-Haul Driving**.  Plaintiff's position excludes the time driving (1) from the yard to the first customer destination and (2) from the last customer destination or landfill to the yard.  None of the hauls can be completed without getting the trucks on the road and there is no suggestion that any driver thought the truck would be parked overnight anywhere but in Republic's yard.  This time may not produce a specific piece, but is a necessary component of the activity, conceptually pro-rated across the day's piece rate production.  Thus the Court FINDS that the to-and-from time that the trucks are on the road outside Republic's yard in the normal course of running a route is production time.

**Truck Breakdowns**.  The Court agrees with Plaintiffs that time lost to a truck's mechanical breakdown or flat tire is non-production time related to Republic's responsibility to maintain its fleet in working order.  Consequently, the Court FINDS that down time due to a truck's need for repair is not included in the zone rates.  Thus, the regular rate required for calculating the overtime premium has been improperly diluted with those non-production hours.

**Searching for Stock**.  Plaintiffs complain that some assignments involve delivering a particular sized box to a customer, but that suitable boxes can be unavailable for ready loading.  So drivers lose time searching for a box, even having to travel to a different yard where the box may or may not be found.  This represents a separate task attributable to poor stock management on the part of Republic and it unduly prolongs the amount of time it takes for a driver to complete the customer delivery.  The Court FINDS

that stock searches are not included in the zone rates and have diluted the regular rate used for calculating the overtime premium.

**DOT Paperwork, Inspections, and Meetings**.   While the pre- and post-trip inspections, duty logs, and meetings regarding safety, OSHA requirements, or general job training may be a necessary part of running a commercial fleet, nothing about those tasks contributes to the effort to actually pick up, haul, and dump trash on a route.   Thus the Court FINDS that these administrative tasks are not included in the zone rates and have diluted the regular rate used for calculating the overtime premium.   The specific amount of time devoted to these tasks is subject to proof in the damages phase of this trial.   See generally, averages twenty to thirty minutes.   Chapa, D.E. 233 (administrative tasks average twenty to twenty-five minutes), p. 66; Benavides, D.E. 234, p. 164; Baca, D.E. 234, p. 203.   For three or four months prior to trial, huddle meetings were conducted every day.   But by trial they had been discontinued.   Benavides, D.E. 234, pp. 165-66.

**Security Clearance**.   Certain customers, primarily prisons and refineries or other manufacturing plants, have extensive, time-consuming security clearance procedures that prevent the drivers from completing hauls within the amount of time ordinarily associated with hauls from the same zones.   Because of the amount of additional time spent on such customers, and because, according to Republic, variances in zone rates are associated only with distance to the landfill rather than complexity of customer needs, the Court FINDS that the time delay attributable to security clearances is non-productive time that has not been compensated through the zone rates, diluting the regular rate used for calculating the overtime premium.

**Fueling, Landfill Wait Time, and Customer Issues**.  The remaining complaints all relate to tasks that are so frequent, regular, or predictable as to be, at least in part, ordinary components of trash hauling routes.  While Plaintiffs rightly complain about container blockages, overflowing boxes, damaged containers, and missing tarps, their testimony that this occurs two or three times daily indicates that it is also reasonably foreseeable albeit randomly encountered.  "[Y]ou pretty much do come to expect it." Benavides, D.E. 234, p. 178.  Thus the Court is not inclined to find these matters— categorically—to be non-production time.  However, matters that unduly prolong completion of the piece beyond the ordinarily foreseeable handling of a route do represent non-production down time.  Thus excessive lines at the fueling station, excessive wait time at the landfill, and excessive time waiting for dispatchers to resolve customer issues or having to engage in additional tasks to resolve customer issues, must be treated as non-productive time diluting the regular rate used to calculate the overtime premium.

The Court FINDS that this work—to the extent that it is excessive—is non-productive.  The Court defers to the damages phase of trial to determine the amount of time that is excessive and non-productive.

**Conclusion**.  Plaintiffs offered evidence of instances in which they experienced down time due to mechanical breakdowns and flat tires; DOT paperwork, inspections, and attending meetings; stock searching; security clearances; and excessive wait times or diversions associated with refueling, landfill lines, and customer issues.  They have thus demonstrated that at least some of the hours constitute unpaid non-production time and

were improperly included in the regular rate calculation, improperly reducing the overtime premium paid.   Plaintiffs provided an estimate of the amount of time represented by these issues.  However, the Court declines to fully quantify the amount of non-production time incurred in this phase of the trial.

For liability purposes, it is sufficient to show that there has been an FLSA violation that affects the amount of the employees' overtime pay.  The Court FINDS that Plaintiffs were not paid any amount of straight-time pay for non-productive time on the clock.  That straight-time claim is not recoverable as a gap claim for any of the first 40 hours worked in a workweek.   However, those uncompensated non-production hours were used improperly when determining the regular rate.   When that artificially low regular rate was used to calculate overtime pay, the overtime hours were not paid the full time-and-a-half in violation of 29 U.S.C. § 207.

## V.     Liquidated Damages and Good Faith

Violation of the maximum hours provision, 29 U.S.C. § 207, permits the assessment of damages for the amount of unpaid overtime compensation earned.   29 U.S.C. § 216(b).  The statute also provides for compensatory damages in the form of liquidated damages (doubling the overtime award), along with attorney's fees, and costs. Under the FLSA,

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional *equal amount as liquidated damages*. . . .  The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a

> reasonable attorney's fee to be paid by the defendant, and costs of the action.

29 U.S.C.A. § 216(b) (emphasis added).   The Portal-to-Portal Pay Act amended the FLSA and provided a good faith defense to the award of liquidated damages:

> [I]f the ***employer*** shows to the satisfaction of the court that the act or omission giving rise to such action was in ***good faith*** and that he had ***reasonable grounds for believing*** that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C.A. § 260 (emphasis added).   Republic claims to have acted in good faith so as to avoid the assessment of the FLSA's liquidated damages.

**Good Faith Standard**.   There are subjective and objective components to the employer's substantial burden of showing good faith.   *E.g.*, *Mireles v. FrioFoods, Inc*., 899 F.2d 1407, 1415 (5th Cir. 1990).   On the issue of subjective good faith, the employer must demonstrate that it "had an honest intention to ascertain what the Act requires and to act in accordance with it."   *Brantley v. Inspectorate Am. Corp*., 821 F. Supp. 2d 879, 895 (S.D. Tex. 2011) (quoting *Dybach v. State of Fla. Dept. of Corr.*, 942 F.2d 1562, 1566 (11th Cir. 1991)).   The employer's conclusion that it was in compliance with the FLSA must also be objectively reasonable.   *Brock v. El Paso Nat. Gas Co.,* 826 F.2d 369, 371 (5th Cir. 1987).   Thus, good faith may be found where the employer violated the FLSA "under a mistaken, although reasonable belief, that its acts were in conformity with the law."   *See Martinez v. Food City, Inc*., 658 F.2d 369, 376 (5th Cir. 1981).

"[G]ood faith requires some duty to investigate potential liability under the FLSA." *Barcellona v. Tiffany English Pub, Inc*., 597 F.2d 464, 468-69 (5th Cir. 1979) (rejecting ignorance, alone, as a good faith defense).  Reliance on the advice of counsel or consultation with the Department of Labor can establish good faith and a lack of willfulness.  *Lee v. Coahoma Cnty., Miss*., 937 F.2d 220, 227 (5th Cir. 1991) (good faith and reasonableness findings affirmed, despite flawed implementation of a plan that had been formulated on expert advice).

**Evidence Regarding Good Faith**.  The evidence reflects that the zone rate-only Roll-Off Driver pay structure is an anomaly—historically, corporately, geographically, and divisionally.  Historically, Chapa testified that Roll-Off Drivers were paid a day rate plus a small per haul rate at all times that he worked in the facility—prior to the advent of the current pay structure.  Chapa, D.E. 233, pp. 48-51.  Corporately, the zone rate structure was not in effect when BFI and Allied were in control.  Chapa, D.E. 233, pp. 49-51.  It was applied only when Republic took over the facility.  *Id*.  Geographically, the Corpus Christi facility was the only division within Republic using this pay structure, causing confusion in its own Human Resources Department.  Scordato email, Plaintiffs' Exhibit 71.  And divisionally, only the Roll-Off Drivers in the Corpus Christi facility were paid this way, contrary to the pay plan terms applicable to Long-Haul, Residential, and Commercial Drivers.

Notably, Long-Haul Drivers who handled similar loads were paid a day rate in addition to the zone rate to compensate them for extra driving time and fewer hauls.  Bradley, D.E. 234, p. 52.  Republic has not explained why the same rationale does not

apply to Roll Off Drivers when they have extra down time and cannot make as many hauls.  While Republic did pay day rates on occasion for down time when the driver had managed to complete a few hauls, the day rate did not apply unless (a) their down time exceeded four hours and (b) their earned zone rates did not exceed their day rate.  If the day rate applied, the per-haul compensation was greatly reduced from the standard zone rates.  Chapa, D.E. 233, p. 110; Medrano, D.E. 233, pp. 185, 197.  In contrast, the Long-Haul Drivers were paid the full zone rate in addition to the full day rate—all day, every day.  Plaintiffs' Exhibit 13; Chapa, D.E. 233, pp. 57-58; Bradley, D.E. 234, p. 56.

Given the dramatic departure represented by the Roll-Off Driver pay structure, one would expect that Republic would have sought and obtained an appropriate legal opinion that the pay scheme satisfied the FLSA as the good faith defense requires.  However, Republic did not do so.  Their claim to good faith is based upon their impression that they did not need any agreement regarding the treatment of non-production time from their employees under federal law.  According to Republic's Senior Corporate Counsel, Kim Bullerdick, that impression was derived from a legal opinion not offered into evidence that California law did require an employer to identify non-production time and establish a wage for it, but that California law differed from federal law in that regard.

Bullerdick admitted that Republic had not sought a legal opinion on federal law with respect to that issue of piece rates and non-production time.  Bullerdick, D.E. 235, pp. 31-32.  Republic exhibited interest regarding the lawfulness of the Corpus Christi pay plan after it settled the *Rodriguez* case in San Antonio, Texas.  Bullerdick, D.E. 235, pp. 34-35.  But the opinion that it sought and obtained only addressed whether the Corpus

Christi pay plan was the same or similar to the *Rodriguez* plaintiffs' pay structure. Plaintiffs' Exhibit 32.  Outside counsel concluded that the pay plans were different, but did not opine that the Corpus Christi pay plan was lawful.  Republic did not seek an opinion on the Corpus Christi structure before this case was filed. Bullerdick, D.E. 235, p. 38.

**Good Faith Not Shown**.  Republic did not satisfy its burden of proof.  There is no evidence that it undertook to ascertain its FLSA compliance before imposing an entirely new pay structure on its Roll-Off Drivers.  They made no attempt to determine whether the piece rate-only plan triggered the requirement of an agreement or understanding under the FLSA.  They disregarded the specialized treatment of piece rate plans and non-production time for purposes of determining the regular rate.  The testimony that a legal opinion on California law gave them an impression of compliance with federal law is not sufficient to demonstrate an affirmative effort to comply.

Instead, the California requirements should have made Republic aware of the issue of non-production time and should have given Republic pause and a desire to ensure that any difference between California law and the FLSA was sufficient to make the zone rates lawful.  Considering the lack of evidence as to what non-production time was built into the zone rates, the Court can only conclude that it was done without regard to the need to properly account for that potential non-productive time.  The Court FINDS that Republic is not entitled to a good faith defense to liquidated damages.

## VI.     Willfulness and the Statute of Limitations

The statute of limitations, and thus the amount of recoverable compensatory damages, can be expanded pursuant to the Portal-to-Portal Pay Act amendments to the FLSA.  "[E]very such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a ***willful*** violation may be commenced within ***three years*** after the cause of action accrued."  29 U.S.C.A. § 255 (emphasis added).  Plaintiffs claim that Republic acted willfully.

**Willfulness Standard**.  Plaintiffs bear the burden of proof to show the employer's willfulness.  *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 135 (1988).  A violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  *Id*. at 133.  An employer who makes a "good-faith but incorrect assumption that a pay plan complied with the FLSA" does not commit a willful violation, even if the decision was unreasonable or negligent.  *See McLaughlin* at 134-35 & n.13.

**Willfulness Not Proven.**  The way that Republic paid its Roll-Off Drivers would have been lawful had Republic reached an agreement or understanding with its employees regarding the way their pay was calculated.  Employers can lawfully seek an agreement whereby the piece rate is deemed to cover all hours worked, including non-production time.  In that event, the manner in which Republic tracked all hours worked and calculated both the regular rate and the overtime premium would have been precisely as required by the FLSA.  With the addition of the safety net of the day rate applied to

excessive down time, Republic's pay complied with the minimum wage and maximum hours/overtime provisions.

While Plaintiffs demonstrated that Republic violated the FLSA's treatment of piece-work pay, they did not prove that Republic was actually aware of the requirement of an agreement.   And while there is good reason for that requirement, it is not a prominent feature of the statute or the regulations such that all employers should have constructive knowledge of it.   Ignorance is no excuse for a violation of the statute, but it does fall short of actual knowledge or reckless disregard required to find the violation willful.

The Court FINDS that Republic made an incorrect or negligent—but not willful— assumption that the FLSA did not require Republic to get affirmative employee consent to the treatment of non-production time in connection with its piece rates.

## VII.   The Court Does Not Decertify this Case as a Collective Action

The Fifth Circuit has not set a legal standard for collective-action certification, recognizing both the *Lusardi*[23] and the Rule 23 class action approaches. *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1216 (5th Cir.1995), *overruled on other grounds*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).   The parties have agreed that the FLSA collective action issues of this case should be governed by the *Lusardi* approach and they have briefed the certification question as whether plaintiffs are similarly situated under

---

[23]   *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987), *mandamus granted in part, appeal dismissed*, *Lusardi v. Lechner*, 855 F.2d 1062 (3rd Cir.1988), *vacated in part, modified in part, and remanded*, *Lusardi v. Xerox Corp.*, 122 F.R.D. 463 (D.N.J.1988), *aff'd in part, appeal dismissed*, *Lusardi v. Xerox Corp.*, 975 F.2d 964 (3rd Cir.1992).

that standard.   Joint Pretrial Order, D.E. 220, p. 20; Motion for Judgment on Partial Findings, D.E. 230, p. 14.

**Plaintiffs Properly Conditionally Certified the Case**.   Republic now challenges whether Plaintiffs ever certified their current non-production claims as a collective action because those claims fully emerged only after the first stage in the *Lusardi* analysis.   D.E. 230, pp. 13-14.   On July 29, 2014, United States Magistrate Judge Jason B. Libby granted Plaintiffs' motion for conditional certification of this matter as a collective action—a matter that Republic did not oppose.   D.E. 41; 160, pp. 2-3.   That Order does not limit certification to any particular issue, but is rather concerned with the employees being in a substantially similar position with respect to their FLSA challenges.   It is a case-wide determination.

On January 3, 2017, this Court entered its Order recognizing that Plaintiffs' non-production time issue was stated within a liberal reading of Plaintiffs' complaint and was not subject to summary judgment or being stricken.   D.E. 158.   Plaintiffs then filed their Third Amended Complaint more fully setting out their claim regarding non-production time.   D.E. 159.

While Republic filed a motion to strike (D.E. 160) and a motion for summary judgment (D.E. 162), neither motion sought to decertify the collective action.   Rather, Republic argued that allowing Plaintiffs to bring the claims would be a surprise and prejudicial because the claims emerged after the close of discovery, with a trial date looming.   D.E. 160, p. 10.   Yet Republic did not file a motion for continuance for this reason, despite the Court's demonstrated willingness to accommodate the parties.   *See*

Scheduling Orders, D.E. 21, 111, 112, 120, 130, 147, 157, 193.  And in its motion for summary judgment on the claim, Republic merely reserved the right to seek decertification.  D.E. 162, p. 3 n.3.

On April 19, 2017, the Court granted, over Republic's objection, Plaintiffs' motion to dismiss from this action all employees except the Roll-Off Drivers employed at the Corpus Christi facility.  The remaining named Plaintiffs and opt-in Plaintiffs are clearly subject to the exact same pay structure.  D.E. 216.  Plaintiffs' claim regarding non-production time is properly subject to collective action treatment as the remaining named Plaintiffs and opt-in Plaintiffs were subjected to the same pay policy.  The Court HOLDS that the conditional certification order encompassed all of Plaintiffs' claims, however they may have evolved, and that proceeding as a collective action is appropriate because Plaintiffs and opt-in Plaintiffs are similarly situated according to the liberal test for conditional certification.

**Republic Did Not Properly Seek Decertification**.  The FLSA, while providing for a collective action procedure, does not spell out the details for how collective actions are certified.  The *Lusardi* approach sets out the stages of certification, but does not establish deadlines for conditional certification, the opt-in deadline, or the consideration of decertification.  One court described the practice regarding the decertification decision as follows:

> The second tier occurs when all putative class members have **filed their consents to opt into the collective action** and further **discovery has taken place** to support the plaintiffs assertions that the defendant violated the FLSA and the matter is **ready for trial**.  At this stage, " 'the court will again

make a certification decision based on the 'similarly situated' standard, but will require a higher level of proof than was necessary at the first stage for conditional certification.' " While the court uses a significantly higher standard to analyze the similarly situated issue at the decertification stage, it is not necessary for putative class members to be identical.  "*If the conditional group of plaintiffs does not meet this standard at the second stage, the group is decertified, the opt-in plaintiffs are dismissed without prejudice* and any remaining plaintiffs are permitted to move onto the trial stage of litigation."  The burden stays with the plaintiff at each stage to demonstrate that other employees are similarly situated.

*Prise v. Alderwoods Grp., Inc.*, 817 F. Supp. 2d 651, 670–71 (W.D. Pa. 2011) (citations omitted; emphasis added).

The time for seeking decertification is after the opt-in deadline, after discovery, but before trial.  Rather than seek decertification when it should have done so (at the time of its dispositive motions), Republic reserved its right to make a challenge.  D.E. 162, p. 3 n.3.  In the joint pretrial order, Republic complained about proceeding as a collective action, but did not file a motion to decertify or request a ruling on that issue.  D.E. 220, p. 6.   Republic allowed Plaintiffs to try the case as a collective action and then waited until after Plaintiffs rested to move for decertification.  D.E. 234, p. 195 (expressly questioning Benavides as a representative plaintiff prosecuting a collective action); Oral Motion, D.E. 235, p. 5; Written Motion, D.E. 230.

The reason that decertification must be raised prior to trial is because of the result that would obtain otherwise.  Republic's motion requests decertification after Plaintiffs have rested and, in the next breath, it requests dismissal with prejudice of the claims of

named Plaintiffs who did not testify.[24]   D.E. 230.   If the case is retroactively decertified, those who relied on the collective nature of the action and allowed other Plaintiffs to represent them will have made a fatal error.   If the Court were to grant the motion, those named Plaintiffs would lose their claims by default.   The Court FINDS that Republic's motion to decertify the class, raised after Plaintiffs have rested their case, was not timely filed and the request was waived.   The Court declines to find any procedural infirmity in proceeding as a collective action and DENIES the motion to decertify.

**Substantive Decertification**.   At the decertification stage of the *Lusardi* approach, the trial court's task is to determine whether the opt-in plaintiffs are similarly situated to the named plaintiffs—not just based on their affidavit testimony, but based on evidence developed during the case proceedings.   *Mooney, supra* at 1213 & n.7.   Three factors are relevant to this determination: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations."   *Id.*

---

[24]   Republic seeks dismissal of any named Plaintiff who did not testify.   This request only applies if the collective action is decertified.   For instance, Republic cites *Taylor v. C.I.R.*, 271 F. App'x 414, 415 (5th Cir. 2008) and *McDaniel v. Lee*, No. CIV. A. 97-3862, 1999 WL 39552 (E.D. La. Jan. 27, 1999) for the propriety of dismissing a case for failure to appear.   Both of those cases involved individual claims, not collective actions, in which no plaintiff appeared for trial.   In *Taylor*, no attorney appeared, either.   Republic offers nothing to relate the dismissals upon default in those cases to a failure of one of many named plaintiffs in a collective action failing to appear.   In a collective action, any named plaintiff may prosecute the case for all members of the class, whether named or opt-in.   29 U.S.C. 216(b).

Republic also cites two FLSA cases for their dismissal proposition:   *Fraser v. Patrick O'Connor & Assocs., L.P.*, No. 4:11-CV-03890, 2016 WL 4159753, at *4 (S.D. Tex. Aug. 4, 2016) and *Rodriguez v. Mech. Tech. Servs., Inc.*, No. A-12-CV-710-DAE, 2015 WL 12551071 (W.D. Tex. May 8, 2015).   But neither applies.   Both involved dismissals for failure to participate in discovery or otherwise prosecute the case in any meaningful way.   Plaintiffs' counsel in *Fraser* even withdrew because the plaintiffs had been nonresponsive.   The respective courts dismissed the cases against those plaintiffs because lesser sanctions would have been ineffective.   Plaintiffs' deference to other Plaintiffs to prosecute the case as a collective action does not illustrate any failure to provide meaningful participation.

(drawing on three of the four factors identified in *Lusardi*, 118 F.R.D. at 359 (using one additional factor applicable to ADEA cases)).

Republic contends that the Roll-Off Drivers are not similarly situated because they work alone and do not monitor the work of other Roll-Off Drivers so as to be able to opine as to what circumstances of non-production time they encounter.  *See* D.E. 234, pp. 195-99 (questioning Plaintiff Benavides' personal knowledge of other drivers' issues). But the question is not whether Plaintiffs all have the same exact work day.  The question is whether they are all subjected to a common policy, plan, or practice—the same factual and employment settings.  *Vanzzini v. Action Meat Distribs.*, 995 F. Supp. 2d 703, 722-23 (S.D. Tex. 2014).  It is clear that all of the Roll-Off Drivers are subjected to a pay plan that was not fully disclosed to them, did not clearly define whether or how non-production time was to be paid, and was applied equally to them as written and as interpreted.

Plaintiffs testified in a consistent manner regarding (1) uncompensated down time for mechanical issues (depending upon the age and maintenance of the truck); (2) excessive landfill wait times, often correlated with bad weather; (3) delays on routes caused by customer-related difficulties in getting and loading their trash containers; (4) delays attributable to locating containers to deliver to customers; (5) administrative time for inspecting vehicles, attending meetings, and checking in and out with dispatch; (6) fueling time; (7) expecting excessive down time to be compensated in addition to zone rates; (8) being given conflicting messages regarding the viability of these complaints; and (9) never seeing any part of the pay plan other than the zone rates.  The Roll-Off

Drivers would observe each other as they checked in at Republic's yard by the appointed time, waited in line for dispatch, attended meetings, and waited in line for fueling and at the landfill.  Baca, D.E. 234, p. 226.

The tasks and equipment assigned to the Plaintiffs varied from day to day, such that any driver could be assigned any customer and any truck and no specific number of hauls was guaranteed.  Serrano, D.E. 234, p. 101.  They generally testified that they faced the same types of issues, delays, and down time.  They also testified consistently about not having agreed to either the way non-production time should be compensated or was compensated.  They challenged their supervisors, wrote down the time in protest on their route and activity sheets, and expected additional compensation.  Plaintiffs testified to being subjected to a common policy, plan, or practice—despite the variations of routes and equipment from one day to another.  Those variations go to the magnitude of the effect of the common decision on individual drivers rather than undermining the fact that it was a common policy, plan, or practice that affected them all.  Variations in the quantity of time lost as uncompensated goes to damages, not liability.

Republic complains that Plaintiffs did not have a single definition of non-production time and "did not know what their haul/zone pay covered."  D.E. 230, p. 14.  But that does not defeat their collective action complaint.  Rather, that is the reason for their FLSA claim—the lack of an agreement of what constituted non-production time and how it was paid.  29 U.S.C. § 207(g).  They are all similarly situated in not having been informed of what Republic deemed non-production time, if any, and hence how they were to be compensated for it.  Their common issues predominate over individual

damage calculations.  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (applying Rule 23 class action certification in FLSA case and finding that variations in individual damages do not prevent certification).  Thus there is every reason to maintain this case as a collective action.  The Court DENIES the motion for judgment on partial findings (D.E. 230) with respect to Republic's request to decertify the collective action as to Roll-Off Drivers.

**Long-Haul Drivers**.  The Court DENIES Republic's request to dismiss the three identified Long-Haul Drivers from this case.  While they work as Long-Haul Drivers, Republic has also employed them as Roll-Off Drivers and Plaintiffs have represented that they are participating only in their Roll-Off Driver capacity.  The Court allows them to participate only in their Roll-Off Driver capacity.

## CONCLUSION

For the reasons set out above, the Court:

- HOLDS that Republic was required to have an agreement or understanding with respect to the payment of non-production time when it paid its Roll-Off Drivers solely on a piece rate basis;

- FINDS that Republic and Plaintiffs did not have an agreement or understanding with respect to the payment of non-production time for Roll-Off Drivers;

- FINDS that the following work represents production time:

  - Non-haul driving (to the first customer and from the last destination);

- FINDS that the following work represents non-production time:

  - Truck breakdowns (such as mechanical failures and flat tires in the fleet Republic maintains);

  - Stock searches (in which drivers have to find boxes in Republic's inventory to deliver to customers);

41 / 42

- o Administrative time:  DOT paperwork, pre- and post-trip vehicle inspections, meetings, and standing in line to check in or out with dispatchers; and

  - o Security clearance delays.

- FINDS that the following work represents non-production time only when excessive:

  - o Fueling the trucks;

  - o Landfill wait time;

  - o Customer delays (such as blocked cans, overloaded boxes, unevenly loaded boxes, and boxes needing to be fixed or have tarps replaced).

- FINDS that Republic's inclusion of non-production hours in its calculation of the regular rate resulted in an amount less than required by the FLSA for the regular rate and the amount to be used for the overtime premium;

- HOLDS that Republic's payment on the basis of piece rates without an agreement or understanding with respect to the treatment of non-production time violated the FLSA, 29 U.S.C. § 207(g);

- FINDS that Republic did not satisfy its burden to show good faith for the purpose of eliminating or mitigating liquidated damages;

- FINDS that Plaintiffs did not satisfy their burden to show that Republic acted willfully so as to extend the statute of limitations to three years;

- DENIES Republic's motion for judgment on partial findings (D.E. 230), DENYING Republic's request to decertify the collective action;

- ORDERS the parties to mediate the question of damages within 60 days; and

- ORDERS the parties to appear for a status conference on August 18, 2017 at 9:00 a.m. to address scheduling the damages portion of this bifurcated trial, if necessary.

ORDERED this 12th day of June, 2017.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE